# ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT** ("Agreement") is made as of August 3, 2006, by and between **Teknor Apex Company**, a Delaware corporation, ("Seller") and **Passport Carpets, Inc.**, a Georgia corporation ("Purchaser").

## RECITALS

A. Seller is in the business of marketing and distributing mats and matting for the industrial and Jan San dealer and distribution network as identified in the customer list provided. (the "Business").

B. Seller desires to sell to Purchaser substantially all of Seller's assets that are related to the Business, and Purchaser desires to purchase said assets, all on the terms and subject to the conditions contained in this Agreement.

## AGREEMENTS

Therefore, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE I
## Purchase and Sale of Assets

1.1 Agreement to Purchase and Sell. On the terms and subject to the conditions contained in this Agreement, Purchaser agrees to purchase from Seller, and Seller agrees to sell to Purchaser, all of Seller's inventory, customer lists and certain equipment related to the Business (as defined in Section 1.2). All of said assets are collectively referred to in this Agreement as the "Purchased Assets". All of the Purchased Assets shall be sold to Purchaser free and clear of any liens, claims, encumbrances or security interests (as herein defined). In no event will Purchaser be obligated to purchase more than $750,000 of Seller's inventory.

1.2 Description of Purchased Assets. The Purchased Assets shall include the following assets owned by Seller and related to the Business:

1.2.1 all inventory related to the Business located as of the Closing Date in Seller's warehouses in Brownsville, TN; City of Industry, CA and Calhoun, GA; and all inventory related to the Business in transit from manufacturer as of the Closing Date (collectively, the "Inventory");

1.2.2 motorized storage system, anti-fatigue cutting table in Brownsville, TN, and anti-fatigue cutting table in the City of Industry, CA warehouse (collectively, the

"Equipment");

1.2.3 all sales orders, quotations and bids pertaining to the Inventory;

1.2.4 all customer lists, customer records and mailing lists;

1.2.5 all other assets of Seller used in the conduct of the Business including toll-free telephone number, style and color names, SKU numbers, catalogs, architectural folders and sample chain sets in the possession of Seller, excepting therefrom only the Excluded Assets;

1.2.6 all goodwill and going concern value relating to the Business.

1.3 Excluded Assets. The Excluded Assets shall consist of the Assets, if any, described on Schedule 1.3 hereto.

## ARTICLE II
## Assumption of Liabilities

2.1 No Assumption Except as specifically provided herein, Purchaser is not assuming, and shall not be liable or responsible for, any liabilities, accruals, debts, obligations, contracts or other commitments of Seller of any kind whatsoever, whether such liabilities are known or unknown, fixed, matured or contingent, including, without limitation, any product liability relating to products manufactured and/or sold by the Seller prior to Closing. Notwithstanding the foregoing, Purchaser agrees to assume (i) Seller's obligation to satisfy unfilled purchase orders from Seller's customers identified on Schedule 2.1 and (ii) Seller's obligations to Seller's suppliers under Seller's purchase orders identified on Schedule 2.1.

## ARTICLE III
## Purchase Price and Closing

3.1 Purchase Price. The purchase price for the Purchased Assets shall be the sum of 3.1.1, 3.1.2, and 3.1.3 determined as follows:

3.1.1. The quantity and category of Inventory shall be jointly determined by Seller and Purchaser as of 9:00 A.M. Eastern Time on the Closing Date. Inventory will be valued at its verified landed cost by Stock Keeping Unit (SKU) at each warehouse location. Inventory will be valued as follows:

(a) 100% of landed cost value: Styles included in this category are Rib, Olefin, Berber, Chevron, Finger Scrape/Ridge Scrape, Comfort Rest, Aqua Master/Aqua Edge, Iron Horse, Comfort Lok, Corrugated Runner.

(b) 75% of landed cost value: Styles included in this category are Diamond

Plate/Tile Top and Stages Inside Outside Transitional Matting Excluding Green.

(c) 50% of landed cost value: Styles included in this category are Coil Mat, X Grip (Plastic Tile), Stages (Green), and Intrepid.

3.1.2 Purchaser shall pay $6,500 for the Equipment.

3.1.3 In addition, Purchaser shall pay royalties to the Seller in the amount of 4% of Purchaser's Net Sales to Active Customers made within two (2) years of the Closing Date. "Active Customers" are defined as customers identified on Seller's customer list attached hereto as Schedule 3.1.3. For purposes of this Section 3.1.3, Net Sales shall mean Purchaser's invoiced sales price less applicable allowances, discounts and returns.

3.2 Manner of Payment.

3.2.1 Purchaser shall pay the purchase price of the Equipment and Inventory by delivery of a promissory note in the form attached hereto as Schedule 3.2.1.

3.2.2 Royalty payments shall be due and payable on the last day of the month following the close of each calendar quarter. Each royalty payment shall be accompanied by a certificate signed by the President of Purchaser setting forth the basis on which the royalties were calculated. Purchaser will maintain complete records of its Net Sales for a minimum period of three (3) years, and Seller will have the right through a certified public accountant approved by Purchaser, such approval not to be unreasonably withheld, at reasonable times and upon reasonable notice, not more than once in any calendar year, to examine any portion of Purchaser's books and records which relate to the sales to Active Customers. Each records examination shall be at the expense of Seller unless that examination discloses a discrepancy in favor of Seller of more than five (5%) percent of the total amounts paid to Seller during the period covered by the examination, in which case Purchaser shall pay Seller for the reasonable expense of that examination. Payments found to be due as a result of an examination shall be paid within fifteen (15) days of notice.

3.3 Time and Place of Closing. The transaction contemplated by this Agreement shall be consummated (the "Closing") at the offices of Minor, Bell & Neal,745 College Drive, Suite B, Dalton, Georgia, on September 15, 2006 or on such other date, or at such other time or place, as shall be mutually agreed upon by Seller and Purchaser. The date on which the Closing occurs in accordance with the preceding sentence is referred to in this Agreement as the "Closing Date" and the Closing shall be deemed to be effective between the parties for all purposes as of 12:01 a.m. on the Closing Date (the "Closing Date").

3.4 Allocation of Purchase Price. The Purchase Price shall be allocated among the Purchased Assets in the manner required by Section 1060 of the Code (as defined herein) and in

accordance with Schedule 3.4 hereto. The parties agree that the form of the transactions (and the consideration therefor) provided for in this Agreement and in the agreements referred to herein were arrived at on the basis of arm's-length negotiation among the parties, and will be respected by them for federal, state, local and other tax reporting purposes (including in filings on Internal Revenue Service Form 8594) and that, neither of them will assert or maintain a position inconsistent with the foregoing.

3.5 Provisions. Personal property or similar taxes, if any, will be prorated as of the Closing Date, with the Seller liable to the extent such items relate to any time period prior to the Date, and the Purchaser liable to the extent such items relate to the time period commencing on or after the Closing.

## ARTICLE IV
## Representations and Warranties

4.1 General Statement. The parties make the representations and warranties to each other which are set forth in this Article IV. All such representations and warranties and all representations and warranties which are set forth elsewhere in this Agreement and in any financial statement, exhibit or document delivered by a party hereto to the other party pursuant to this Agreement or in connection herewith shall survive the Closing (and none shall merge into any instrument of conveyance) regardless of any investigation or lack of investigation by any of the parties to this Agreement. No specific representation or warranty shall limit the generality or applicability of a more general representation or warranty. All representations and warranties of Seller are made subject to the exceptions which are noted in the schedule delivered by Seller to Purchaser concurrently herewith and identified by the parties as the "Disclosure Schedule". Each section of the Disclosure Schedule shall be numbered to correspond to the paragraph of this Agreement to which such section relates.

4.2 Purchaser's Representations and Warranties. Purchaser represents and warrants to Seller that:

4.2.1 Organization. Purchaser is a corporation duly organized, validly existing and in good standing, under the laws of the State of Georgia.

4.2.2 Qualification. Purchaser is qualified to do business, and is in good standing, under the laws of all jurisdictions where the nature of its business or the nature or location of its assets used in it business requires such qualification and where the failure to so qualify would have a Material Adverse Effect (as herein defined). For purposes of this Agreement, "Material Adverse Effect" means a material adverse effect on the assets, liabilities, financial condition, results of operations or prospects of its business, taken as a whole. All jurisdictions in which Purchaser is qualified as a foreign corporation with respect to the Business are set forth in Section 4.3.2 of the Disclosure Schedule.

4.2.3 Power and Authority. Purchaser has full power and authority to enter into and perform (a) this Agreement and (b) all documents and instruments to be executed by Purchaser pursuant to this Agreement (collectively, "Purchaser's Ancillary Documents"). This Agreement has been, and Purchaser's Ancillary Documents will be, duly executed and delivered by a duly authorized officer of Purchaser. The Agreement constitutes a valid and legally binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms (except to the extent that enforcement may be affected by laws relating to bankruptcy, reorganization, insolvency and creditors' rights and by the availability of injunctive relief, specific performance and other equitable remedies).

4.2.4 Consents. No consent, authorization, order or approval of, or filing or registration with, any governmental authority is required for the execution and delivery by Purchaser of this Agreement and Purchaser's Ancillary Documents, and the consummation by Purchaser of the transactions contemplated by this Agreement and Purchaser's Ancillary Documents.

4.2.5 Conflicts with Organizational Documents or Law. Neither the execution and delivery of this Agreement and Purchaser's Ancillary Documents by Purchaser, nor the consummation by Purchaser of the transactions herein contemplated, will conflict with or result in a breach of any of the terms, conditions or provisions of Purchaser's Articles of Incorporation or Bylaws, or of any statute or administrative regulation, or of any order, writ, injunction, judgment or decree of any court or governmental authority or of any arbitration award.

4.2.6 Conflicts with Agreements. Purchaser is not a party to any unexpired, undischarged or unsatisfied written or oral contract, agreement, indenture, mortgage, debenture, note or other instrument under the terms of which performance by Purchaser according to the terms of this Agreement will be a default, or an event of acceleration or grounds for termination, or whereby timely performance by Purchaser according to the terms of this Agreement may be prohibited, prevented or delayed.

4.2.7 Material Adverse Changes.

4.2.7.1 Except as set forth in Schedule 4.2.7, Purchaser has not suffered or been threatened with (and Purchaser has no knowledge of any facts which may cause or result in) any material adverse change in the business, operations, assets, liabilities, financial condition or prospects of its business, including, without limiting the generality of the foregoing, the existence or threat of any labor dispute, or any material adverse change in, or loss of, any relationship between Purchaser and any of its key employees.

4.2.7.2 Except as set forth in Schedule 4.2.7, Purchaser has no knowledge of any intention or indication by a "Significant Customer" (as herein defined) to

terminate its business relationship with Purchaser or to limit or alter its business relationship with Purchaser in any material respect. Purchaser has no knowledge of any intention or indication of intention by a "Significant Supplier" (as herein defined) to terminate its business relationship with Purchaser or to limit or alter its business relationship with Purchaser in any material respect. As used herein, (a) "Significant Customer" means any of the 20 largest customers of its business, measured in terms of sales volume in dollars for the year ended December 31, 2005 and (b) "Significant Supplier" means any supplier of Purchaser with respect to its business from whom Purchaser has purchased $100,000 or more of goods during either of the years ended December 31, 2004 or 2005.

4.2.8 Litigation; Contingent Liabilities.

4.2.8.1 There is no litigation, action, suit or proceeding, in law or in equity, and there are no proceedings or governmental investigations before any commission or other administrative authority, pending, or, to Purchaser's knowledge, threatened, against Purchaser relating to its business, the consummation of the transactions contemplated hereby, or the use of the Purchased Assets.

4.2.8.2 There are no facts which, if known by a potential claimant or governmental authority, would give rise to a claim or proceeding which, if asserted or conducted with results unfavorable to Purchaser, would have a material adverse effect on the business, operations, assets, liabilities, financial condition or prospects of the Purchaser, or the consummation of the transaction contemplated hereby, or the use of the Purchased Assets.

4.2.9 Decrees and Arbitration Awards. Purchaser is not a party to, or bound by, any decree, order, judgment, writ, settlement or similar agreement or arbitration award (or agreement entered into in any administrative, judicial or arbitration proceeding with any governmental authority) with respect to the properties, assets, personnel or business activities of the Business.

4.2.10 Compliance with Law. Purchaser is in compliance in all material respects with each decree, order, writ, judgment or arbitration award, or law, statute, or regulation of or agreement with, or permit from, any federal, state, local or other governmental authority (or to which the properties, assets, personnel or business activities of Purchaser are subject), including laws, statutes and regulations relating to equal employment opportunities, fair employment practices, wages, hours, benefits, collective bargaining, payment of social security and similar Taxes, occupational safety and health, plant closings, sexual harassment, and sex, race, religious and age discrimination. Purchaser has not received from any governmental authority any written notification with respect to possible noncompliance of any decree, order, writ, judgment or arbitration award or law, statute, or regulation.

4.3 Seller's Representations and Warranties. Seller represents and warrants to Purchaser that, except as set forth in the Disclosure Schedule:

4.3.1 Organization. The Seller is duly organized, validly existing and in good standing, under the laws of the state of Delaware. Seller has all necessary power and authority to own, lease and operate its properties and assets and to conduct the Business as the Business is now being conducted. Seller does not own, directly or indirectly, any capital stock on other equity, securities of any corporation or other entity engaged in the Business, or have any direct or indirect equity interest in, or operate, manage or otherwise control, any business related to the Business other than the Business.

4.3.2 Qualification. Seller is qualified to do business, and is in good standing, under the laws of all jurisdictions where the nature of the Business or the nature or location of its assets used in the Business requires such qualification and where the failure to so qualify would have a Material Adverse Effect (as herein defined). For purposes of this Agreement, "Material Adverse Effect" means a material adverse effect on the assets, liabilities, financial condition, results of operations or prospects of the Business, taken as a whole. All jurisdictions in which Seller is qualified as a foreign corporation with respect to the Business are set forth in Section 4.3.2 of the Disclosure Schedule.

4.3.3 Power and Authority. Seller has full power and authority (and has been duly authorized by appropriate corporate action) to enter into, deliver and perform (a) this Agreement and (b) all documents and instruments to be executed by Seller pursuant to this Agreement (collectively, "Seller's Ancillary Documents"), and to consummate the transactions contemplated hereby and thereby. This Agreement has been, and Seller's Ancillary Documents will be, duly executed and delivered by duly authorized officers of Seller. This Agreement constitutes, and at the Closing each of the Seller's Ancillary Documents will constitute, valid and legally binding obligations of Seller, enforceable against Seller in accordance with its terms (except to the extent that enforcement may be affected by laws relating to bankruptcy, reorganization, insolvency and creditors' rights and by the availability of injunctive relief, specific performance and other equitable remedies).

4.3.4 Consents. No consent, authorization, order or approval of, or filing or registration with or notice to, any governmental authority or any other Person is required for the execution, delivery and performance of this Agreement and Seller's Ancillary Documents and the consummation by Seller of the transactions contemplated by this Agreement and Seller's Ancillary Documents.

4.3.5 Conflicts. Neither the execution, delivery and performance of this Agreement and Seller's Ancillary Documents by Seller, nor the consummation by Seller of the transactions herein contemplated, will violate, conflict with or result in a breach of any of the terms, conditions or provisions of Seller's Articles of Incorporation, by-laws, and other governing agreements ("Seller's Governing Documents") or of any statute or administrative

regulation, law, or of any order, writ, injunction, judgment or decree of any court or any governmental authority or of any arbitration award.

4.3.6 Title to Assets. Seller has good and marketable title to, and the corporate power to sell, and will sell, the Purchased Assets free and clear of any liens, claims, encumbrances and security interests.

4.3.7 Transactions with Related Parties. The Disclosure Schedule describes each: (a) business relationship relating to or in connection with the conduct of the Business (excluding employee compensation and other ordinary incidents of employment) existing on the date of this Agreement between (i) Seller and (ii) any present or former officer, manager, owner, stockholder or employee of Seller (all such Persons encompassed by this clause (iii) being sometimes collectively referred to herein as the "Related Parties" and individually as a "Related Party"); (b) transaction relating to or in connection with the conduct of the Business occurring between January 1, 2006 and the date of this Agreement between Seller and any Related Party; and (c) amount owing by or to any of the Related Parties, respectively, to or from Seller relating to or in connection with the conduct of the Business as of the date of this Agreement. No property or interest in any property (including, without limitation, designs and drawings concerning machinery) which relates to and is or will be necessary or useful in the present or currently contemplated future operation of the Business, is presently owned by or leased by or to any Related Party. Prior to the Closing Date, all amounts due and owing to or from Seller by or to any of the Related Parties (excluding employee compensation and other ordinary incidents of employment) relating to or in connection with the conduct of the Business shall be paid in full. Neither Seller nor any Related Party has an interest, directly or indirectly, in any business, corporate or otherwise, which is in competition with the Business.

4.3.8 Financial Information and Customers. Seller has delivered to Purchaser financial information which fairly and accurately presents in all material respects the financial conditions and results of the operations of the Business by Seller through June 30, 2006. Seller has no knowledge of any intention or indication by a "Significant Customer" (as herein defined) to terminate its business relationship with Seller or to limit or alter its business relationship with Seller in any material respect. Seller has no knowledge of any intention or indication of intention by a "Significant Supplier" (as herein defined) to terminate its business relationship with Seller or to limit or alter its business relationship with Seller in any material respect. As used herein, (a) "Significant Customer" means any of the twenty (20) largest customers of the business, measured in terms of sales volume in dollars for the year ended December 31, 2005, and (b) "Significant Supplier" means any supplier of Seller with respect to the Business from whom Seller has purchased $100,000 or more of goods during either of the years ended December 31, 2004 or 2005.

4.3.9 Conflicts With Agreements. Seller is not a party to, or bound by, any unexpired, undischarged or unsatisfied Contract, under the terms of which the execution,

delivery and performance by Seller of this Agreement and the consummation of the transactions contemplated hereby will require a consent, approval, or notice or will result in a breach, lapse, cancellation, right to terminate, default or acceleration of any right or obligation or result in a lien on any of the Purchased Assets.

4.3.10 Permits. Seller possesses all material licenses, permits, registrations and governmental approvals ('Permits') which are required in order for Seller to conduct the Business as presently conducted. All of the Permits are listed on the Disclosure Schedule and Seller has delivered copies of such Permits to Purchaser, all of which are true and correct in all material respects.

4.3.11 Government Contracts. Seller is not subject to any liability, or claim therefor, for or with respect to price adjustment under any contract with the U.S. Government or any agency thereof, including any liability for defective pricing. 4.3.12 Litigation; Contingent Liabilities.

4.3.12.1 There is no litigation, action, suit or proceeding, in law or in equity, and there are no proceedings or governmental investigations before any commission or other administrative authority, pending, or, to Seller's knowledge, threatened, against Seller relating to the Business, the consummation of the transactions contemplated hereby, or the use of the Purchased Assets (whether used by Purchaser after the Closing or by Seller prior thereto).

4.3.12.2 There are no facts which, if known by a potential claimant or governmental authority, would give rise to a claim or proceeding which, if asserted or conducted with results unfavorable to Seller, would have a material adverse effect on the business, operations, assets, liabilities, financial condition or prospects of the Business, or the consummation of the transaction contemplated hereby, or the use of the Purchased Assets (whether by Purchaser after the Closing or by Seller prior thereto).

4.3.12.3 Seller has not made any oral or written warranties with respect to the quality or absence of defects of the products or services which it has sold or performed in the conduct of the Business which are in force as of the date hereof, except for those warranties which are described in the Disclosure Schedule, There are no material claims pending or, to the best of Seller's knowledge, anticipated or threatened against Seller with respect to the quality of or absence of defects in such products or services.

4.3.13 Decrees and Arbitration Awards. Seller is not a party to, or bound by, any decree, order, judgment, writ, settlement or similar agreement or arbitration award (or agreement entered into in any administrative, judicial or arbitration proceeding with any governmental authority) with respect to the properties, assets, personnel or business activities of the Business.

4.3.14 Compliance with Law. Seller is in compliance in all material respects with each decree, order, writ, judgment or arbitration award, or law, statute, or regulation of or agreement with, or Permit from, any federal, state, local or other governmental authority relating directly to the Business (or to which the properties, assets, personnel or business activities of the Business are subject), including laws, statutes and regulations relating to equal employment opportunities, fair employment practices, wages, hours, benefits, collective bargaining, payment of social security and similar Taxes, occupational safety and health, plant closings, sexual harassment, and sex, race, religious and age discrimination. Seller has not received from any governmental authority any written notification with respect to possible noncompliance of any decree, order, writ, judgment or arbitration award or law, statute, or regulation relating directly to the Business.

4.3.15 Sufficiency of Purchased Assets. The Purchased Assets are adequate to conduct the Business as it is presently being conducted, and the Purchased Assets conveyed to Purchaser on the Closing Date will be adequate to enable Purchaser to continue to conduct the Business as it is presently being conducted.

4.3.16 Disclosure. Seller has furnished to Purchaser complete and accurate copies of all documents and information requested by Purchaser, which documents and information were complete and accurate in all material respects.

4.3.17 Finders' Fees. Neither Seller nor Stockholder have dealt with any Person who is or may be entitled to a broker's commission, finder's fee, investment banker's fee or similar payment from Purchaser for arranging the transactions contemplated hereby or introducing the parties to each other.

4.3.18 Customers. Seller has no knowledge of any intention or indication by a "Significant Customer" (as herein defined) to terminate its business relationship with Seller or to limit or alter its business relationship with Seller in any material respect. Seller has no knowledge of any intention or indication of intention by a "Significant Supplier" (as herein defined) to terminate its business relationship with Seller or to limit or alter its business relationship with Seller in any material respect. As used herein, (a) "Significant Customer" means any of the twenty (20) largest customers of the Business, measured in terms of sales volume in dollars for the year ended December 31, 2005, and (b) "Significant Supplier" means any supplier of Seller with respect to the Business from whom Seller has purchased $100,000 or more of goods during either of the years ended December 31, 2004 or 2005.

## ARTICLE V
## Conduct Prior to the Closing

5.1 General. Seller and Purchaser shall have the rights and obligations with respect to the period between the date hereof and the Closing Date which are set forth in the remainder of this Article V.

5.2 Seller's Obligations. The following are Seller's obligations:

5.2.1 Seller shall give to Purchaser's officers, employees, attorneys, consultants, accountants and lenders reasonable access during normal business hours to all of the properties, books, contracts, documents and records of Seller and shall furnish to Purchaser such information as Purchaser may at any time and from time to time reasonably request. Any disclosure during such investigation shall not constitute an expansion of the representations and warranties made by Seller to Purchaser herein.

5.2.2 Seller shall carry on the Business in the usual and ordinary course consistent with past practices, including with respect to the payment of payables and the collection of receivables.

5.3 Joint Obligations. The following shall apply with equal force to Seller and Purchaser:

5.3.1 Without implication that such laws apply to the transactions contemplated hereby, Seller and Purchaser shall not comply with the provisions of the Uniform Commercial Code of any state relating to bulk sales unless such compliance is required by any lender to Purchaser. Seller shall indemnify and hold Purchaser harmless for any damage, cost or expense associated with failure to comply with the bulk sale law. If a lender to Purchaser requires compliance with bulk sales laws, Seller and Purchaser shall deliver such documents and perform such acts as are required to be performed by them respectively in order that the sale of the Purchased Assets will be in compliance with the provisions of said bulk sales laws.

5.3.2 Each party shall promptly give the other party written notice of the existence or occurrence of any condition which would make any representation or warranty herein contained of either party untrue or which might reasonably be expected to prevent the consummation of the transaction contemplated hereby.

5.3.3 No party shall intentionally perform any act which, if performed, or intentionally omit to perform any act which, if omitted to be performed, would prevent or excuse the performance of this Agreement by any party hereto or which would result in any representation or warranty herein contained of said party being untrue in any material respect as if originally made on and as of the Closing Date.

5.3.4 Each party shall use its respective best efforts to take, or cause to be taken, all actions and to do, or cause to done, all things necessary, proper or advisable to consummate the transactions contemplated hereby as soon as practicable.

5.4 Risk of Loss. All risk of loss with respect to the Purchased Assets shall remain with Seller until the Closing Date and, assuming the occurrence of the Closing, shall pass to

Purchaser effective as of the Closing Date. If, prior to the Closing, any damage to or loss of any of the Purchased Assets occurs due to fire, flood, riot, theft, Act of God or other casualty, and if Purchaser does not elect, or is not permitted by the terms of this Agreement to elect, to terminate this Agreement, the Purchase Price shall be reduced to reflect the value of the remaining Purchased Assets.

## ARTICLE VI
## Conditions to Closing

6.1 Conditions to Seller's Obligations. The obligation of Seller to consummate the transactions contemplated hereby is subject to fulfillment of all of the following conditions, upon the non-fulfillment of any of which this Agreement may, at Seller's option, be terminated pursuant to and with the effect set forth in Article X:

6.1.1 Each and every representation and warranty made by Purchaser shall have been true when made and shall be true and correct in all material respects as if originally made on and as of the Closing Date.

6.1.2 All obligations of Purchaser to be performed hereunder through, and including on, the Closing Date (including all obligations which Purchaser would be required to perform at the Closing if the transactions contemplated hereby were consummated) shall have been fully performed.

6.1.3 Purchaser shall not be subject to any order or injunction of a court of competent jurisdiction that prohibits the consummation of the transactions contemplated by this Agreement.

6.1.4 Purchaser agrees not to compete with Seller in the traditional food service market segment by soliciting or conducting business with any of Sellers existing customers for three (3) years.

6.2 Conditions to Purchaser's Obligations. The obligation of Purchaser to consummate the transactions contemplated hereby is subject to the fulfillment of all of the following conditions, upon the non-fulfillment of any of which this Agreement may, at Purchaser's option, be terminated pursuant to and with the effect set forth in Article X:

6.2.1 Each and every representation and warranty made by Seller shall have been true and correct when made and shall be true and correct in all material respects as if originally made on and as of the Closing Date.

6.2.2 All obligations of Seller to be performed hereunder through, and including on, the Closing Date (including all obligations which Seller would be required to perform at the Closing if the transactions contemplated hereby were consummated) shall have been fully

performed.

6.2.3 Seller shall not be subject to any order or injunction of a court of competent jurisdiction that prohibits the consummation of the transactions contemplated by this Agreement.

6.2.4 During the period from the date of this Agreement to the Closing Date: (a) there shall not have occurred, and there shall not exist on the Closing Date, any condition or fact which, individually or in the aggregate, has, or which reasonably may be expected to result in, a Material Adverse Effect; and (b) neither the Business nor the Purchased Assets shall have been materially and adversely affected by reason of any loss, condemnation, destruction or damage, whether or not insured against.

6.2.5 Purchaser shall have concluded its due diligence to its reasonable satisfaction.

6.2.6 Seller shall have executed and delivered a non-compete agreement in the form of Exhibit "B" attached hereto and made a part hereof, pursuant to which Seller agrees (with the exception of Eastern Bag and Paper and Acme Supply) not to compete in the industrial and commercial matting business for three (3) years, including the industrial/jan san marketplace.

6.2.7 Seller shall have entered into a written sublease for a maximum of 10,000 square feet of Seller's warehouse in City of Industry, CA at $0.32 per square foot per month for six (6) months and upon terms satisfactory to Seller and Purchaser.

6.2.8 Seller and Purchaser shall have entered into a two (2) year contract wherein Seller shall purchase from Purchaser vinyl backed mat and matting products, so long as mats and matting products are of comparable quality and price to competitive products. Purchaser maintains a reasonable service level.

6.2.9 Seller shall have transferred all Inventory from Seller's Brownsville, TN warehouse and Inventory controlled at a Calhoun, GA warehouse to Purchaser's Calhoun, GA distribution facility at no charge to Purchaser.

6.2.10 Seller shall permit Purchaser to purchase rubber matting products from manufacturers in India utilizing molds owned by Seller so long as such molds are operational. Seller shall have no obligation to maintain such molds for the benefit of Purchaser.

6.2.11 Seller shall have consented in writing to sell Purchaser Competitor Mats, Ridge Scraper (Scrape Tread) Mats, Challenger Mats, and Super Foam at landed cost. Provided, however, the aggregate quantity of such products shall not exceed the number of units sold in the fourth quarter of 2005 calendar year for each style listed above.

6.2.12 Seller shall provide Purchaser with reasonable assistance with Customer Service requests for a minimum period of fourteen (14) days prior to Closing and a maximum period of thirty (30) days following the Closing.

**ARTICLE VII**
**Deliveries**

7.1 Form of Documents. At the Closing, the parties shall deliver the documents, and shall perform the acts, which are set forth in this Article VII. All documents which Seller shall deliver shall be in form and substance reasonably satisfactory to Purchaser and Purchaser's counsel. All documents which Purchaser shall deliver shall be in form and substance reasonably satisfactory to Seller and Seller's counsel.

7.2 Purchaser's Deliveries. Subject to the fulfillment or written waiver of the conditions set forth in Section 6.2, Purchaser shall execute and/or deliver to Seller all of the following:

7.2.1 the promissory note referred to in Section 3.2.1;

7.2.2 an incumbency and specimen signature certificate with respect to the officers of Purchaser executing this Agreement and Purchaser's Ancillary Documents on behalf of Purchaser;

7.2.3 certified copies of resolutions of the Purchaser's stockholders, authorizing the execution, delivery and performance of this Agreement and Purchaser's Ancillary Documents;

7.2.4 a closing certificate duly executed by senior officers of Purchaser specifically authorized to do so, on behalf of Purchaser, pursuant to which Purchaser represents and warrants to Purchaser that: (a) Purchaser's representations and warranties to Purchaser are true and correct as of the Closing Date as if then originally made (except to the extent any specific representation and warranty is expressly made as of an earlier date, in which case (with respect to such representation and warranty) as of such date), or, if any such representations or warranties are untrue in any respects, specifying the respects in which the same are untrue; (b) all covenants required by the terms hereof to be performed by Purchaser on or before the Closing Date, to the extent not waived in writing by Purchaser, have been so performed (or, if any such covenant has not been so performed, indicating that such covenant has not been performed); and (c) all documents to be executed and delivered by Purchaser at the Closing have been executed by duly authorized officers of Purchaser;

7.2.5 such other documents from Purchaser, as may reasonably be

required in order to effectuate the transactions contemplated hereby and by Purchaser's Ancillary Documents.

7.3 Seller's Deliveries. Subject to the fulfillment or written waiver of the conditions set forth in Section 6.1, Seller shall deliver to Purchaser physical possession of all tangible Purchased Assets, and shall execute (where applicable in recordable form) and/or deliver or cause to be executed and/or delivered to Purchaser all of the following:

7.3.1 incumbency and specimen signature certificates with respect to the officers of Seller executing this Agreement and Seller's Ancillary Documents on behalf of Seller;

7.3.2 certified copies of resolutions of Seller's board of directors and stockholders, authorizing the execution, delivery and performance of this Agreement and Seller's Ancillary Documents;

7.3.3 a bill of sale, executed by Seller, conveying all of the Purchased Assets, free and clear of all liens, claims, encumbrances and security interests and containing the warranties of title and limitations on warranties, each as set forth in this Agreement;

7.3.4 Seller shall also execute and deliver (in recordable form where required) separate assignments of any of such Purchased Assets, and where applicable, in the form reasonably required by the applicable governmental agencies, insurance companies, customers, lessors, and other parties with whom the assignments must be filed;

7.3.5 a closing certificate duly executed by senior officers of Seller specifically authorized to do so, on behalf of Seller, pursuant to which Seller represents and warrants to Purchaser that: (a) Seller's representations and warranties to Purchaser are true and correct as of the Closing Date as if then originally made (except to the extent any specific representation and warranty is expressly made as of an earlier date, in which case (with respect to such representation and warranty) as of such date), or, if any such representations or warranties are untrue in any respects, specifying the respects in which the same are untrue; (b) all covenants required by the terms hereof to be performed by Seller on or before the Closing Date, to the extent not waived in writing by Purchaser, have been so performed (or, if any such covenant has not been so performed, indicating that such covenant has not been performed); and (c) all documents to be executed and delivered by Seller at the Closing have been executed by duly authorized officers of Seller;

7.3.6 releases of all liens and other encumbrances, including security interests held by lenders of Seller on any of the Purchased Assets.

7.3.7 a notice of this transaction, to be given to customers and suppliers of Seller, in form and substance reasonably satisfactory to Purchaser and Seller; and

7.3.8 such other documents from Seller, as may reasonably be required in order to effectuate the transactions contemplated hereby and by Seller's Ancillary Documents.

## ARTICLE VIII
## Post-Closing Agreements

8.1 Post-Closing Agreements. From and after the Closing, the parties shall have the respective rights and obligations which are set forth in the remainder of this Article VIII.

8.2 Use of Intellectual Property. Seller agrees to permit Purchaser to continue to use the descriptions, colors, trade names and SKU numbers associated with the Inventory. Purchaser acknowledges that Seller will continue to own and use the names, colors and descriptions and SKU numbers in its food service business.

8.3 Third Party Claims. Subject to, and without limiting the rights or obligations of the parties pursuant to, any other provision of this Agreement, the parties shall cooperate with each other with respect to claims, litigation and other proceedings made or commenced by third parties either subsequent to the Closing Date and, in connection therewith, shall make available, upon reasonable advance notice and without expense to the requesting party (other than for reasonable out-of-pocket travel and travel-related items, which shall be promptly reimbursed by the requesting party) personnel as are reasonably necessary in connection therewith (for reasonable periods of time and at such times as will not unreasonably disrupt such providing-party's business) for purposes of preparation, investigation, analysis, depositions, interrogations, testimony and other like matters.

8.4 Further Assurances. The parties shall execute such further documents, and perform such further acts, as may be necessary to transfer and convey the Purchased Assets to Purchaser, on the terms herein contained, and to otherwise comply with the terms of this Agreement and consummate the transactions contemplated hereby.

8.5 Non-Competition; Non-Solicitation; Confidentiality. In consideration of the benefits of this Agreement to Seller and in order to induce Purchaser to enter into this Agreement, Seller shall enter into a non-competition, non-solicitation and a confidentiality agreement with respect to the industrial and commercial matting business (but excluding Seller's food service business) in the form of Exhibit B hereto and made a part hereof.

## ARTICLE IX
## Indemnification

9.1 General. From and after the Closing, the parties shall indemnify each other as

provided in this Article IX. No specifically enumerated indemnification obligation with respect to a particular subject matter as set forth below shall limit or affect the applicability of a more general indemnification obligation as set forth below with respect to the same subject matter. For the purposes of this Article IX, each party shall be deemed to have remade all of its representations and warranties contained in this Agreement at the Closing with the same effect as if originally made at the Closing.

9.2 Certain Definitions. As used in this Agreement, the following terms shall have the indicated meanings:

9.2.1 "Damages" shall mean all assessments, levies, losses, fines, penalties, damages, costs and expenses, including reasonable attorneys', accountants', investigators', and experts' fees and expenses, sustained or incurred in connection with the defense or investigation of any Third Party Claim;

9.2.2 "Indemnified Party" shall mean a party hereto who is entitled to indemnification from another party hereto pursuant to this Article IX;

9.2.3 "Indemnifying Party" shall mean a party hereto who is required to provide indemnification under this Article IX to another party hereto;

9.2.4 "Third Party Claim" shall mean any claim, action, suit, proceeding, investigation or like matter asserted or threatened by a party other than the parties hereto, their successors and permitted assigns, against any Indemnified Party or to which an Indemnified Party is subject.

9.3 Indemnification Obligations of Seller. Subject to the provisions of Section 9.4, Seller shall indemnify, save and keep harmless Purchaser and its successors and permitted assigns ("Purchaser Indemnitees") against and from all Damages sustained or incurred by any of them resulting from or arising out of or by virtue of:

9.3.1 any inaccuracy in or breach of any representation and warranty made by Seller or the Stockholder in this Agreement or in any closing document delivered by Seller in connection with this Agreement;

9.3.2 any breach by Seller, or failure by Seller to comply with, any of its covenants or obligations under this Agreement (including their obligations under this Article IX or under Seller's Ancillary Documents);

9.3.3 the failure to discharge when due any liability or obligation of Seller or any claim against Purchaser with respect to any such liability or obligation or alleged liability or obligation related to the Business, including without limitation, liability on account of taxes payable by Seller or for which Seller is liable, either by operation of law or pursuant to the

provisions of this Agreement, without regard to the fact that any indemnifiable matter described in this Section 9.3.3 may have been disclosed in the Disclosure Schedule or in any documents included or referred to therein or may be otherwise known to Purchaser at the date of this Agreement or on the Closing Date;

9.3.4 any claim or liability relating to any employee pension benefit plan (as defined by Section 3(2) of ERISA) or any employee welfare benefit plan (as defined in Section 3(1) of ERISA) which Seller or any ERISA Affiliate has at any time maintained or administered or to which Seller or any ERISA Affiliate has at any time contributed (including, without limitation, any liability arising pursuant to Title W of ERISA for plan termination, withdrawal or partial withdrawal from any multiemployer plan, or any lien to enforce any Title IV liability).

9.3.5 any claim or liability relating to discrimination of any employee of Seller and arising prior or after the Closing Date.

9.4 Purchaser Indemnification Covenants. Purchaser shall indemnify, save and keep harmless Seller and its successors and permitted assigns against and from all Damages sustained or incurred by any of them resulting from or arising out of or by virtue of:

9.4.1 any inaccuracy in or breach of any representation and warranty made by Purchaser in this Agreement or in any closing document delivered to Seller in connection with this Agreement;

9.4.2 any breach by Purchaser of, or failure by Purchaser to comply with, any of its covenants or obligations under this Agreement (including its obligations under this Article IX) or under the Purchaser's Ancillary Documents;

9.4.3 acts or omissions of Purchaser after the Closing Date including, but not limited to, Purchaser's operation of the Business after the Closing Date.

9.5 Cooperation. Subject to the provisions of Section 9.6, the Indemnifying Party shall have the right, at its own expense, to participate in the defense of any Third Party Claim, and if said right is exercised, the parties shall cooperate in the investigation and defense of said Third Party Claim.

9.6 Third Party Claims. Forthwith following the receipt of notice of a Third Party Claim, the party receiving the notice of the Third Party Claim shall (a) notify the other party of its existence setting forth in writing and with reasonable specificity the facts and circumstances of which such party has received notice and (b) if the party giving such notice is an Indemnified Party, specifying in writing the basis hereunder upon which the Indemnified Party's claim for indemnification is asserted. No failure to give timely notice shall relieve the Indemnifying Party of liability except to the extent of actual prejudice resulting from such failure. The Indemnified Party may, upon reasonable notice, tender the defense of a Third Party Claim to the

Indemnifying Party. If the defense of a Third Party Claim is so tendered and within thirty (30) days thereafter such tender is accepted without qualification by the Indemnifying Party, or within thirty (30) days after the date on which written notice of a Third Party Claim has been given pursuant to this Section 9.6, the Indemnifying Party shall acknowledge in writing, without qualification, to the Indemnified Party that it will defend said Third Party Claim; then, except as hereinafter provided, the Indemnified Party shall not, and the Indemnifying Party shall, have the right to contest, defend, litigate and settle such Third Party Claim. The Indemnified Party shall have the right to be represented by counsel at its own expense in any such contest, defense, litigation or settlement conducted by the Indemnifying Party, provided that the Indemnified Party shall be entitled to reimbursement therefore, if the Indemnifying Party shall lose its right to contest, defend, litigate and settle the Third Party Claim as herein provided. The Indemnifying Party shall lose its right to contest, defend, litigate and settle the Third Party Claim if it shall fail to diligently contest the Third Party Claim. So long as the Indemnifying Party has not lost its right to defend, contest, litigate and settle as herein provided, the Indemnifying Party shall have the exclusive right to contest, defend and litigate the Third Party Claim and shall have the exclusive right, in its discretion exercised in good faith, and with the advice of counsel, to settle any such matter, either before or after the initiation of litigation, at such time and upon such terms as it deems fair and reasonable, provided that at least ten (10) days prior to any such settlement, written notice of its intention to settle shall be given to the Indemnified Party. All expenses (including attorneys fees) incurred by the Indemnifying Party in connection with the foregoing shall he paid by the Indemnifying Party. Notwithstanding the foregoing, in connection with any settlement negotiated by an Indemnifying Party, no Indemnified Party shall be required by an Indemnifying Party to (x) enter into any settlement that does not include as an unconditional term thereof the delivery by the claimant or plaintiff to the Indemnified Party of a release from all liability in respect of such claim or litigation, (y) enter into any settlement that attributes by its terms liability to the Indemnified Party or (z) consent to the entry of any judgment that does not include as a term thereof a full dismissal of the litigation or proceeding with prejudice. No failure by an Indemnifying Party to acknowledge in writing its indemnification obligations under this Article X shall relieve it of such obligations to the extent they exist. If an Indemnified Party is entitled to indemnification against a Third Party Claim, and the Indemnifying Party fails to accept or assume the defense of a Third Party Claim pursuant to this Section 9.6, or if, in accordance with the foregoing, the Indemnifying Party shall lose its right to contest, defend, litigate and settle such a Third Party Claim, the Indemnified Party shall have the right, without prejudice to its right of indemnification hereunder, in its discretion exercised in good faith, and upon the advice of counsel, to contest, defend and litigate such Third Party Claim, and may settle such Third Party Claim, either before or after the initiation of litigation, at such time and upon such terms as the Indemnified Party deems fair and reasonable, provided that at least ten (10) days prior to any such settlement, written notice of its intention to settle is given to the Indemnifying Party. If, pursuant to this Section 9.6, the Indemnified Party so contests, defends, litigates or settles a Third Party Claim for which it is entitled to indemnification hereunder, as hereinabove provided, the Indemnified Party shall be reimbursed by the Indemnifying Party for the reasonable attorneys' fees and other expenses of defending, contesting, litigating and/or settling the Third Party Claim which are incurred from time to time,

forthwith following the presentation to the Indemnifying Party of itemized bills for said attorneys' fees and other expenses.

9.7 Period and Threshold for Making Claims. The obligation of Seller to indemnify Purchaser pursuant to this Article IX shall extend for two (2) years after the Closing Date. Seller's liability for indemnification shall not exceed, in the aggregate, $250,000.

## ARTICLE X
## Effect of Termination/Proceeding

10.1 General. The parties shall have the rights and remedies with respect to the termination and/or enforcement of this Agreement which are set forth in this Article X.

10.2 Right to Terminate. This Agreement and the transactions contemplated hereby may be terminated at any time prior to or at the Closing:

10.2.1 by the mutual written consent of Purchaser and Seller;

10.2.2 by prompt notice given in accordance with Section 11.2, by Seller, on the one hand, or Purchaser, on the other hand, if the Closing shall not have occurred at or before 11:59 p.m. on August 1, 2006; provided, however, that the right to terminate this Agreement under this Subsection 10.2.2 shall not be available to any party whose failure to fulfill any material obligation under this Agreement has been the cause of or resulted in the failure of the Closing to occur on or prior to the aforesaid date.

10.2.3 by Purchaser at any time if Purchaser (i) determines in good faith that a material adverse change, or any condition or event which threatens to cause an adverse change, with respect to Seller, its Business or the Purchased Assets, shall have occurred or been discovered since January 1, 2006, or (ii) has reasonable cause to be dissatisfied with the results of its due diligence.

10.3 Certain Effects of Termination. In the event of the termination of this Agreement by either Seller or Purchaser as provided in Section 10.2:

10.3.1 Purchaser's right of access pursuant to this Agreement shall terminate and each party, if so requested by the other party, will return promptly every document furnished to it by the other party (or any subsidiary, division, associate or Affiliate of such other party) in connection with the transaction contemplated hereby, whether so obtained before or after the execution of this Agreement, and any copies thereof (except for copies of documents publicly available) which may have been made, and will use reasonable efforts to cause its representatives and any representatives of financial institutions and investors and others to whom such documents were furnished promptly to return such documents and any copies thereof any of

them may have made;

10.3.2 All information received by any party hereto with respect to the business of the other party hereto or its subsidiaries, divisions, Affiliates or associates or with respect to the Business (other than information which is a matter of public knowledge or which has heretofore been or is hereafter publicly published in any publication for public distribution or filed as public information with any governmental authority) shall not, unless otherwise required by law, at any time be disclosed to third parties by such party for any reason whatsoever for a period of five (5) years from date of termination. This Section 10.3 shall survive any termination of this Agreement.

10.4 Remedies. Notwithstanding any termination right granted in Section 10.2, in the event of the nonfulfillment of any condition to a party's closing obligations as of the Closing Date; such party may elect to do one of the following:

10.4.1 Proceed to close despite the no fulfillment of any closing condition, the consummation of the Closing shall not be deemed a waiver of a breach warranty or covenant or of such party's rights and remedies with respect thereto;

10.4.2 Decline to close, terminate this Agreement as provided in Section 10.2, and thereafter seek damages to the extent permitted in Section 10.5; or

10.4.3 Seek specific performance of the obligations of the other party. Each party hereby agrees that in the event of any breach by such party of this Agreement, the remedies available to the other party at law would be inadequate and that such party's obligations under this Agreement may be specifically enforced.

10.5 Right to Damages. If this Agreement is terminated pursuant to Section 10.2.2, neither party hereto shall have any claim against the other except if the circumstances giving rise to such termination were caused either by the other party's no fulfillment of a closing obligation as of the Closing Date or the other party's material breach of any obligation, representation and warranty contained in the Agreement by such other party being in a material respect incorrect when made, in which event termination pursuant to Section 10.2.2 shall not be deemed or construed as limiting or denying any legal or equitable right or remedy of said party, and said party shall also be entitled to recover, without limitation, its costs and expenses which are incurred in pursuing this transaction or pursuing its rights and remedies (including reasonable attorneys' fees).

## ARTICLE XI
## Miscellaneous

11.1 Publicity. Except as otherwise required by law or applicable stock exchange rules, press releases and other publicity concerning this transaction shall be made only with the prior

agreement of Seller, and Purchaser (and, in any event, Seller and Purchaser shall use all reasonable efforts to consult and agree with each other with respect to the content of any such required press release or other publicity). Except as otherwise required by law or applicable stock exchange rules or as expressly permitted by Seller, no such press releases or other publicity shall state the amount of the Purchase Price.

11.2 Notices. All notices required or permitted to be given hereunder shall be in writing and may be delivered by hand, by facsimile, by nationally recognized private courier, or by United States mail. Notices delivered by mail shall be deemed given three (3) business days after being deposited in the United States mail, postage prepaid, registered or certified mail (return receipt requested). Notices delivered by hand, by facsimile, or by nationally recognized private courier shall be deemed given on the first business day following receipt; provided, however, that a notice delivered by facsimile shall only be effective if such notice is also delivered by hand, or deposited in the United States mail, postage prepaid, registered or certified mail (return receipt requested), on or before two (2) business days after its delivery by facsimile. All notices shall be addressed as follows:

If to Seller:
Addressed to:

Teknor Apex Company
505 Central Avenue
Pawtucket, RI 02861

________________________

Facsimile No.: _____________

With a copy to:
Drew P. Kaplan
Chace Ruttenberg & Freedman, LLP
One Park Row, Suite 300
Providence, RI 02903

If to Purchaser
Addressed to:

**Passport Carpets, Inc.**
PO Box 305
Calhoun, GA 30703
Attn: Jeff Chilton
Facsimile No.: 706-625-4165

With copies to: James H. Bisson, III
Minor, Bell & Neal
P. O. Box 2586
Dalton, GA 30722-2586

And/or to such other respective addresses and/or addressees as may be designated by notice given in accordance with the provisions of this Section 11.2.

11.3 Expenses. Except as otherwise expressly stated herein, each party hereto shall bear all fees and expenses incurred by such party in connection with, relating to or arising out of the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, including financial advisors', attorneys', accountants' and other professional fees and expenses.

11.4 Entire Agreement. This Agreement and Purchaser's Ancillary Documents and Seller's Ancillary Documents (Purchaser's Ancillary Documents and Seller's Ancillary Documents together being referred to herein as the "Ancillary Agreements") constitute the entire agreement between the parties and shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. Each exhibit, schedule and the Disclosure Schedule, shall be considered incorporated into this Agreement and the Ancillary Agreements.

11.5 Non-Waiver. The failure in any one or more instances of a party to insist upon performance of any of the terms, covenants or conditions of this Agreement, to exercise any right or privilege in this Agreement conferred, or the waiver by said party of any breach of any of the terms, covenants or conditions of this Agreement, shall not be construed as a subsequent waiver of any such terms, covenants, conditions, rights or privileges, but the same shall continue and remain in full force and effect as if no such forbearance or waiver had occurred. No waiver shall be effective unless it is in writing and signed by an authorized representative of the waiving party. A breach of any representation, warranty or covenant shall not be affected by the fact that a more general or more specific representation, warranty or covenant was not also breached.

11.6 Counterparts. This Agreement may he executed in multiple counterparts, each of which shall be deemed to be an original, and all such counterparts shall constitute but one instrument.

11.7 Severability. The invalidity of any provision of this Agreement or portion of a provision shall not affect the validity of any other provision of this Agreement or the remaining portion the applicable provision.

11.8 Applicable Law. This Agreement shall be governed and controlled as to validity,

enforcement, interpretation, construction, effect and in all other respects by the internal laws of the State of Georgia applicable to contracts made in that State. Notwithstanding the foregoing, the promissory note and the payment of royalties referred to in this Agreement shall be governed and controlled as to validity, enforcement, interpretation, construction, effect and in all other respects by the internal laws of the State of Rhode Island.

11.9 Binding Effect; Benefit. This Agreement shall inure to the benefit of and he binding upon the parties hereto and their successors and permitted assigns.

11.10 Assignability. This Agreement shall not be assignable by either party prior to the Closing without the prior written consent of the other party (which may he withheld for any reason or no reason whatsoever) except that, prior to Closing, Purchaser may assign any or all of its rights and delegate its any or all of its duties under this Agreement to an entity affiliated with Purchaser, and Purchaser may assign this Agreement for collateral security purposes to its lender providing financing for the purchase of the Purchased Assets pursuant to the provisions hereof.

11.11 Amendments. This Agreement shall not be modified or amended except pursuant to an instrument in writing executed and delivered on behalf of each of the parties hereto.

11.12 Rule of Construction. The parties acknowledge and agree that each has negotiated and reviewed the terms of this Agreement, assisted by such legal and tax counsel as they desired, and has contributed to its revisions. The parties further agree that the rule of construction that any ambiguities are resolved against the drafting party will be subordinated to the principle that the terms and provisions of this Agreement will be construed fairly as to all parties and not in favor of or against any party. The headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement. The word "including", means "including, without limitation."

11.13 Governmental Reporting. Anything to the contrary in this Agreement notwithstanding, nothing in this Agreement shall be construed to mean that a party hereto or other Person must make or file, or cooperate in the making or filing of, any return or report to any governmental authority in any manner that such Person or such party reasonably believes or reasonably is advised is not in accordance with law,

11.14 Consent to Jurisdiction. This Agreement has been executed and delivered in and shall be deemed to have been made in Calhoun, Georgia. Seller and Purchaser each agrees to the exclusive jurisdiction of the Superior Court of Gordon County, Georgia, with respect to any claim or cause of action arising under or relating to this Agreement. Notwithstanding the foregoing, Seller and Purchaser each agrees to the exclusive jurisdiction of the Rhode Island with respect to any claim or cause of action pertaining to the Purchaser's default under the promissory note or payment of royalties referred to in this Agreement. Seller and Purchaser each waives any objection based on personal jurisdiction or forum non conveniens and waives any objection to venue of any action instituted hereunder. Nothing in this paragraph shall affect the right to serve

legal process in any other manner permitted by law.

11.15 Waiver of Trial by Jury. Each of the parties hereto waives the right to a jury trial in connection with any suit, action or proceeding seeking enforcement of such party's rights under this Agreement.

11.16 Third Party Rights. Nothing in this Agreement, express or implied, is intended to confer on any Person not a party to this Agreement any right or remedy by reason of this Agreement.

11.17 Taxes and Fees. Seller shall pay all transfer taxes of any kind, all sales and use taxes and all recording and filing fees which arise as a result of the

IN WITNESS WHEREOF, the parties have executed this Asset Purchase Agreement as of the date first above written.

Seller:

**TEKNOR APEX COMPANY**

By: [signature: Jonathan D. Fain]
President

Purchaser:

**PASSPORT CARPETS, INC.**

By: [signature: Jeffrey S. Crittenden]
President

PROMISSORY NOTE

$490,786

Pawtucket, Rhode Island
September 15, 2006

FOR VALUE RECEIVED, PASSPORT CARPETS, INC., a Georgia corporation (the "Payor"), promises to pay to the order of TEKNOR APEX COMPANY, a Delaware corporation (the "Holder"), the sum of Four Hundred Ninety Thousand Seven Hundred Eighty-Six and no/100 ($490,786.00) Dollars as hereinafter provided.

The Payor shall make four (4) equal principal payments in the amount of One Hundred Twenty-Two Thousand Six Hundred Ninety-Six and 50/100 ($122,696.50) Dollars beginning November 15, 2006, and continuing on January 15, 2007, and February 15, 2007, and March 15, 2007.

The Payor may prepay all or any part of the principal hereof at any time and from time to time without premium or penalty.

In the event that this Note is not paid when due, the Payor agrees to pay all costs and expenses (including reasonable attorneys' fees) incurred by Holder in the collection of sums due hereunder, and shall pay interest, after default, at the rate of twelve (12%) percent per annum.

All payments shall be applied first to interest due and the balance only to principal. The Payor expressly agrees that no renewal or extension granted, whether by acceptance of interest in advance or otherwise, nor any indulgence shown to, nor any release of, nor any dealings between Holder and the Payor shall discharge, extend, or in any way affect the obligation of the Payor as principal debtor hereunder.

All references to Holder shall be deemed to apply to any holder for the time being of this Note, and the terms hereof shall be binding on the successors and assigns of the Payor.

The Payor waives presentment for payment, protest and demand, any notice of protest, demand and/or dishonor and nonpayment of this Note, and all other notices or demands otherwise required by law that the Payor may lawfully waive.

The rights and obligations of the Payor and all provisions hereof shall be governed by and construed in accordance with the laws of the State of Rhode Island, except to the extent that such laws are superseded by Federal enactments.

The Payor hereby submits to the jurisdiction of the courts of the State of Rhode Island and the United States District Court for the District of Rhode Island, as well as to the jurisdiction of all courts to which an appeal may be taken or other review sought from the aforesaid courts, for the purpose of any suit, action or other proceeding arising out of the Payor's obligations under or with respect to this Note, and expressly waives any and all obligations it may have as to venue in any of such courts. THE PAYOR WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY THE PAYOR ON ANY MATTER WHATSOEVER (INCLUDING, WITHOUT LIMITATION, ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS NOTE, OR ANY OTHER DOCUMENTS EXECUTED IN CONNECTION HEREWITH OR ANY TRANSACTIONS CONTEMPLATED HEREIN OR THEREIN). No party to this Note, including but not limited to any assignee or successor of a party, shall seek a jury trial in any lawsuit, proceeding, counterclaim, or any other litigation procedure based upon, or arising out of, this Note, any related instruments, any collateral or the dealings or the relationship between the parties. No party will seek to consolidate any such action, in which a jury trial has been waived, with any other action in which a jury trial cannot be or has not been waived. THE PROVISIONS OF THIS PARAGRAPH HAVE BEEN FULLY DISCUSSED BY THE PARTIES HERETO, AND THESE PROVISIONS SHALL BE SUBJECT TO NO EXCEPTIONS. NO PARTY HAS

IN ANY WAY AGREED WITH OR REPRESENTED TO ANY OTHER PARTY THAT THE PROVISIONS OF THIS PARAGRAPH WILL NOT BE FULLY ENFORCED IN ALL INSTANCES.

All agreements between the Payor and the Holder are hereby expressly limited so that in no contingency or event whatsoever, whether by reason of acceleration of maturity of the indebtedness evidenced hereby or otherwise, shall the amount paid or agreed to be paid to the Holder for the use, forbearance or detention of the indebtedness evidenced hereby exceed the maximum permissible under the applicable law.

IN WITNESS WHEREOF, the Payor has executed this Note as of the day and year first above written.

PASSPORT CARPETS, INC.

By: Jeffrey S. Chilton